UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Docket No. 14-cr-10356-WGY |
| ) | |
| ROBERT H. BRAY ) | |

**DEFENDANT ROBERT H. BRAY'S MOTION
FOR <u>BOOKER</u> VARIANCE AND SENTENCING MEMORANDUM**

NOW COMES the Defendant, Robert H. Bray, by and through undersigned counsel, and requests this Honorable Court sentence Mr. Bray to six months home confinement, followed by three years of supervised release, forfeiture of $299,762.15 in United States currency, and a $100,000 fine. In support of this sentencing request, Mr. Bray states as follows:

I.   <u>Authority to Impose a Non-Guideline Sentence.</u>

<u>United States. v. Booker</u>, 543 U.S. 220 (2005), authorizes this Court to impose a non-guideline sentence. Although the sentencing process must commence with a guideline calculation, the United States Sentencing Guidelines (USSG) are merely advisory, and district courts are required to consider all of the factors listed in 18 U.S.C. §3553(a) in imposing sentence. <u>Gall v. United States</u>, 128 S.Ct. 586, 596-97 (2007); <u>Kimbrough v. United States</u>, 552 U.S. 85 (2007); <u>Booker</u>, 543 U.S. at 262; <u>United States v. Martin</u>, 520 F.3d 87, 91 (1st Cir. 2008) ("A district court should begin its sentencing analysis with the advisory guidelines calculation, then its "next steps should include hearing argument from parties as to the proper sentence in a particular case, weighing the

applicability of the sundry factors delineated in 18 U.S.C. §3553(a), reaching an ultimate sentencing determination, and explicating that decision on the record.") (citing, Gall, 128 S.Ct. at 596-97). The paramount directive in 18 U.S.C. §3553(a) is that the Court must impose a sentence that is "sufficient, but not greater than necessary," to achieve the underlying purposes of the sentencing statute. 18 U.S.C. §3553(a). Section 3553(a) directs sentencing courts to consider a number of factors, *inter alia*:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>    (A)  to reflect the seriousness of the offense;
>    (B)  to afford adequate deterrence to criminal conduct;
>    (C)  to protect the public from further crimes of the defendant; and
>    (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
>
> Id.

The importance of, and rationale for, the post-Booker and Gall sentencing procedure described above has been summarized by the First Circuit Court of Appeals as follows:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

Martin, 520 F.3d at 91 (citing Gall, 128 S.Ct. at 598).

II. Calculation of Appropriate Advisory Guideline Range

A. Base Offense and Offense Characteristics

Mr. Bray concurs with the Probation Department that pursuant to the USSG, his conviction for securities fraud is level 8. Further, as his gain was approximately $300,000 that results in a 12 level increase for a total offense level of 20. Offense level 20 on the sentencing grid provides a range of 33-41 months incarcerated. (PSR ¶¶ 27, 28).

B. Obstruction of Justice Adjustment

Mr. Bray objects to the Obstruction of Justice adjustment being included in the calculation of his total offense level. (PSR ¶¶ 22, 24, 31). Mr. Bray disputes that his answers to interrogatories propounded by the S.E.C were false. (PSR ¶ 22). The particular answer to an interrogatory that the PSR references which are dated July 2, 2015, requested Mr. Bray to clarify certain assertions that were made in his Wells Submission to the S.E.C. In essence, these responses indicated that Mr. Bray was very familiar with Wainwright Bank prior to getting the information from Mr. O'Neill concerning Eastern Bank's interest in acquiring it.[1] These clarifying responses attempted to assert that the information from Mr. O'Neill was not the sole basis or reason Mr. Bray purchased shares of Wainwright stock. The PSR also references Mr. Bray's *pro se* Answer to the S.E.C.'s complaint which was dated September 17, 2014, where as part of a general denial, he denied every receiving a tip from O'Neill. (PSR ¶ 22).[2] The PSR does not reference Mr. Bray's First Supplemental Answer to the S.E.C.'s First Set of

---

[1] See Trail Exhibit # 24, United States v. Bray, 14-10356 (D. Mass. 2016) (Young, J.).
[2] See Trail Exhibit # 12, United States v. Bray, 14-10356 (D. Mass. 2016) (Young, J.).

Page 3 of 10

Interrogatories.[3] In this Answer which is dated July 30, 2015, with the benefit of counsel, Mr. Bray acknowledges that in June of 2010, Mr. O'Neill communicated to him that Eastern Bank was interested in Wainwright Bank.[4] This Supplemental Answer should mitigate what was initially stated in the Answer. Neither of the items discussed in the PSR rise to the level of the type of conduct described in Application Note #4(B) to USSG §3C1.1, thereby justifying the Adjustment for Obstruction of Justice.

    C. Corrected Total Offense Level

Mr. Bray requests that Adjustment for Obstruction of Justice be removed from his Offense Level Computation, leaving a Total Offense Level of 20.

  III.    Mr. Bray's Individual Characteristics Make a Compelling Case for a Sentence Below the Range Recommended by the Guidelines

    A. No Prior Criminal History

Mr. Bray is currently 78 years old and has no prior criminal convictions. He was charged with four misdemeanors in the late 1980s and early 1990s that were all dismissed prior to any adjudication. Three of the four offenses were City Ordinance Violations arising out of the Cambridge District Court. Mr. Bray has owned and sold residential and commercial property in the City of Cambridge for over 30 years. He has never been incarcerated before and was given a criminal history score of zero by the U.S. Probation Department. (PSR ¶ 39).

    B. Strong Family Connections

Mr. Bray has always had a close and strong relationship with his mother and siblings as a result of his father dying unexpectedly when he was only three years old. He

---

[3] See Trail Exhibit # 13, United States v. Bray, 14-10356 (D. Mass. 2016) (Young, J.).
[4] Id.

began working at a young age to help his mother support their family. Mr. Bray's mother worked in the educational field as a teacher and then later as a headmaster in Arlington, MA, among other places. Mr. Bray's mother died in 1968, at the age of 64 from cancer. Mr. Bray has two brothers and one sister, who range in age from 76-80 and all reside in various cities in New Hampshire. Given how close Mr. Bray and his siblings are in age, they have always enjoyed a close relationship and they all remain close and visit with each other frequently.

C. <u>Military Service</u>

Mr. Bray served in the United States Air Force from 1957 until 1964. Domestically, he was stationed at bases in California, Texas, Maryland, and Massachusetts. Mr. Bray was stationed overseas in France from 1961-1962. He achieved the rank of Airman Basic during his time in the United States Air Force and was honorably discharged.

D. <u>Physical Health</u>

Mr. Bray has several different serious health problems, as would be expected of anyone his age. He is generally being treated and monitored for these problems by his primary care doctor, Dr. Stephen P. Ranere of Belmont Medical Associates, Inc. Dr. Ranere examined Mr. on April 7, 2016, and wrote a report in letter format to undersigned counsel listing Mr. Bray's medical problems. Dr. Ranere's report is attached hereto and incorporated herein.

E. <u>Community Impact</u>

For the last 30 years, Mr. Bray has owned and operated a Laundromat at 73 River Street, in the Central Square section of Cambridge, MA. There are approximately 30

pieces of equipment located within the Laundromat, and it is open every day from 7:00 a.m. until 9:00 p.m. Many residents in and around Central Square depend on utilizing Mr. Bray's Laundromat. Mr. Bray is personally responsible for opening and/or closing, the Laundromat on daily basis, as well as coordinating the service of any of the machines as needed. There is no one that could take over these duties for Mr. Bray in the event he was sentenced to a period of incarceration, the Laundromat would have to be closed, and the real-estate would have to be sold or rented to another tenant. Mr. Bray's experience in running a Laundromat is that it is not a very lucrative business, and in the event that he closed his, it is virtually certain that another tenant would not be interested in continuing to utilize the space as a Laundromat.

 F. <u>Employment</u>

Mr. Bray has been the owner and operator of R & B Construction, Inc. ("R & B") for the last 30 years. R & B is primarily engaged in commercial and residential real estate development and its principal office is located at 75 River Street, Cambridge, MA. Presently, R & B's main client is Harvard University. R & B has been hired by Harvard to supervise and coordinate the renovation of Harvard's laboratories and other buildings. This business relationship between Harvard and R & B has been in place for approximately 29 years and is based upon Mr. Bray's longstanding relationship with various university officials.

In addition to Mr. Bray, R & B has three full time employees. John Freeman (Freeman) is the production manager at R & B. He is responsible for overseeing work crews and otherwise coordinating work efforts. Freeman has worked for R & B for approximately 28-30 years. He is married and has two children, one of whom is about to

go to college. Freeman's wife does volunteer work in the City of Medford. Freeman was previously listed an owner of R & B construction in the event that something happened to Mr. Bray, and he was unable continue working for R & B, Freeman would take over. During that approximately 15 years however, it became clear to both Freeman and Bray that Freeman was not capable of managing the business side of R & B construction in terms of finding new clients, negotiating contracts, and maintaining current clients. David Gilreath (Gilreath) is the primary construction supervisor for R & B at Harvard. He has worked for R & B for approximately 30 years and is married with two children. Gilreath's wife is very ill, and he is their only source of income. He also supports his two children to some extent. Kelly Allen is the secretary and office manager at R & B. She has worked at R & B for approximately six years, is divorced, and has a young child in school.

The harsh reality is that there is no one that could take over for Mr. Bray in terms of running R & B if he were to be incarcerated, and, in all likelihood, it would have to close down. While Mr. Bray would be able to survive financially if R & B ceased to exist, it would create a tremendous financial hardship for the employees and their dependents.

IV. A Sentence of Home Confinement Followed by a Period of Supervised Release, Forfeiture of the Profits, and a Fine Would Adequately Reflect the Seriousness of the Offense in this Case

A. Incarceration not Necessary in this Case

Taking into account that Mr. Bray has never before been convicted of any crime in any court during his 78 years alive shows what type of character he has and what type of life he has led thus far. There is no question that Securities Fraud is a serious crime

requiring a serious sentence. That must be weighed against the facts of the case and the individual so convicted. This case did not involve a pattern of conduct on Mr. Bray's part. It was an isolated incident. The Court has a variety of sentencing options available that could balance the seriousness of the offense of Securities Fraud with the individual convicted, Mr. Bray. It does not make sense or seem just that the only way to make clear that this case represented a serious offense is to sentence Mr. Bray to some period of incarceration within the Federal Bureau of Prisons.

V. A Sentence of Home Confinement Followed by a Period of Supervised Release, Forfeiture of the Profits, and a Fine Would Adequately Act as a Deterrence to Criminal Conduct

A. The Sentence Mr. Bray Proposes is Significant

To determine if a sentence would act as a deterrent, the only logical class of people that should be so deterred are those similarly situated to Mr. Bray. That is the very reason that the USSG are advisory; they cannot fairly and accurately take into account all of the individual characteristics of a defendant a sentencing Court should consider when imposing a sentence. The sentence Mr. Bray is suggesting is significantly harsh to deter those similarly situated from engaging in Securities Fraud. The proposed sentence involves restrictions on his liberty while also imposing significant financial sanctions. This sentence clearly stands for the proposition that age, health status, or lack of criminal background will not excuse criminal conduct.

VI. <u>A Sentence of Home Confinement Followed by a Period of Supervised Release, Forfeiture of the Profits, and a Fine Would Protect the Public From Further Crimes of Mr. Bray</u>

    A. <u>Mr. Bray will not Commit Another Crime</u>

Mr. Bray is currently 78 years old and has never before been convicted of a crime. He started (and continues to run) a successful construction business for the last 30 years. The main client of his business is Harvard University. This conduct by Mr. Bray is clearly an aberration to him otherwise leading a law abiding and productive life. There is no logical reason to predict or assume that he would ever again involve himself in criminal conduct, especially after going through this experience from arrest through the termination of his sentence.

VII. <u>Mr. Bray does not need Educational or Vocational Training, or other Correctional Treatment</u>

    A. <u>Sentencing Mr. Bray to a Period of Incarceration within the Federal Bureau of Prisons would not Provide him with Medical Care in the most Effective Manner</u>

Mr. Bray is not at a point in his life where he is about to embark on a new career or return to school. He is a successful business man who has no personal financial debt or liabilities, not something many people can say. He does not suffer from any drug or alcohol addictions and never has. He has never seen a reason to obtain psychiatric counseling of any form. What Mr. Bray does have are several different medical conditions that are being monitored by his primary care physician, who has been treating him for the last 20 years. To deprive Mr. Bray of this same treatment would certainly only be to his detriment.

VIII. <u>Conclusion</u>

For all of the foregoing reasons, Mr. Bray respectfully ask this Honorable Court to sentence him in this matter to six months home confinement, followed by three years of supervised release, forfeiture of $299,762.15 in United States currency, and a $100,000 fine.

        Respectfully Submitted
        for the Defendant
        Robert Bray,

        /s/ Joseph W. Monahan
        JOSEPH W. MONAHAN, III
        mplaw@verizon.net
        Monahan & Padellaro
        92 High Steet, Suite T-2A
        Medford, MA 02155
        BBO# 351100
        (TEL) (781) 393-5500

Date: May 2, 2016

**CERTIFICATE OF SERVICE**

I, Joseph W. Monahan, III, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

        /s/ Joseph W. Monahan
        JOSEPH W. MONHAHAN, III

Dated: May 2, 2016